PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Plaintiff,

and

Appalachian Power Company and National Steel Corporation, Intervening Plaintiffs,

v.

The UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

The Baltimore and Ohio Railroad Company et al., Intervening Defendants.

Civ. A. No. 73-175.

United States District Court, S. D. West Virginia, Charleston Division.

Oct. 12, 1973.

John E. Lee, Gen. Counsel, Cassius H. Toon, Atty., Public Service Commn., Charleston, W. Va., for plaintiff, Public Service Commission of West Virginia.

F. Paul Chambers, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., and Walter J. Myskowski, Washington, D. C., for intervening plaintiff, Appalachian Power Co.

F. Paul Chambers, W. Warren Upton, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., and Charles W. Chapman, Washington, D. C., for intervening plaintiff, National Steel Corp.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty. Dept. of Justice, Washington, D. C., John A. Field, III, U. S. Atty. and Robert B. King, Asst. U. S. Atty., Charleston, W. Va., for defendant, United States.

Fritz R. Kahn, Gen. Counsel, Hanford O'Hara, Atty., Richard H. Streeter, Atty., Interstate Commerce Commn., Washington, D. C., for defendant, Interstate Commerce Commn.

Edward W. Eardley, Steptoe & Johnson, Charleston, W. Va., Richard W. Kienle, Roanoke, Va., Charles N. Marshall, Baltimore, Md., for intervening defendants, The Baltimore & Ohio Railroad Co., The Chesapeake & Ohio Railway Co., Norfolk & Western Railway Co., Western Maryland Railway Co., and Penn Central Transportation Co. (George P. Baker, Richard C. Bond, and Jervis Langdon, Jr., Trustees).

Paul Rodgers, Gen. Counsel, Sumner J. Katz, Asst. Gen. Counsel, Walter Kurylo, Deputy Asst. Gen. Counsel, Washington, D. C., for National Association of Regulatory Utility Commissioners, amicus curiae.

Before FIELD, Circuit Judge, KNAPP, Chief District Judge, and HALL, District Judge.

## MEMORANDUM OPINION AND ORDER

PER CURIAM.

In this action plaintiff, Public Service Commission of West Virginia, a state public utility regulatory agency, hereinafter sometimes identified as PSC, complains that a report and orders of the defendant, Interstate Commerce Commission, a public utility regulatory agency of the federal government, hereinafter at times identified as ICC, involving intrastate freight rates in West Virginia, are unlawful, arbitrary, capricious, null and void, and asks the Court to suspend, enjoin, set aside and annul the report and orders. The United States of America is named as a party defendant. On their respective motions, Appalachi-an Power Company and National Steel Corporation were allowed to intervene as parties plaintiff and five railroad companies, The Baltimore and Ohio Railroad Company, The Chesapeake and Ohio Railway Company, Norfolk and Western Railway Company, Western Maryland Railway Company, and Penn Central Transportation Company (George P. Baker, Richard C. Bond, and Jervis Langdon, Jr., Trustees), were allowed to intervene as parties defendant.

A District Court of three judges was designated and convened for hearing and determination of the action. 28 U.S.C., § 2284 and § 2325.

Intervening plaintiff National Steel Corporation filed a motion for "an interlocutory injunction *pendente lite* restraining defendants in accordance with the prayer of the complaint pending a final hearing and determination of this cause." In addition to other evidence considered by the Court on hearing the motion for an interlocutory injunction, two affidavits in support of the injunction were filed. A lengthy and detailed affidavit made by Richard G. Warren, Director of Traffic and Transportation for National Steel Corporation, cites irreparable injuries which will result to his Corporation's business and operations if the railroad freight rates herein involved are allowed to become effective. Elizabeth V. Hallanan, Chairman of the Public Service Commission of West Virginia, states in her affidavit that power companies operating in West Virginia have fuel adjustment clauses in their filed tariffs allowing increased charges to their customers when fuel costs increase. She further states that "if the increased freight rates are permitted to go into effect, the consumers of electric power in West Virginia could be irreparably harmed."

The Court's jurisdiction is based on 28 U.S.C., §§ 1336, 2284, 2321–2325; 49 U.S.C., § 17(9); and 5 U.S.C., §§ 701–706.

Following the hearing on the motion, the Court granted the interlocutory in-

junction, *pendente lite*, enjoining defendants from making the increased freight rates effective and noting that "harm to all parties will be minimized by setting this matter down for accelerated disposition on the merits." The action was heard on the merits on September 5, 1973, and was submitted to the Court for decision on the record.

Paragraphs V, VI and VII of plaintiff's complaint, filed June 19, 1973, state the following facts:

In Ex Parte No. 262, Increased Freight Rates, 1969, 337 I.C.C. 436, effective November 18, 1969, the Interstate Commerce Commission authorized a general increase of 6 percent in interstate freight rates; in Ex Parte No. 265, Increased Freight Rates, 1970, 339 I.C.C. 125, effective June 9, 1970, it authorized a further general increase of 6 percent; and in Ex Parte No. 267, Increased Freight Rates, 1971, 339 I.C.C. 125, effective April 12, 1971, it authorized still a further increase of 14 percent generally, except 8 percent on traffic from, to, or within the South.

The railroads operating in West Virginia filed tariffs with the Public Service Commission proposing to increase their West Virginia intrastate rates by 6, 6, and 15 percent, but refused to present any evidence which would enable this Commission to determine whether such increased rates would meet the West Virginia statutory test that the rates shall not be more than the service is reasonably worth, considering the cost thereof. In the absence of such evidence, the proposed rate increases were necessarily disapproved and the tariffs were ordered canceled.

Upon the filing of a petition by the railroads operating in West Virginia, the Interstate Commerce Commission instituted an investigation under the provisions of Section 13(4) of the Interstate Commerce Act to determine whether the railroad rates and charges for the intrastate transportation of property in the State of West Virginia cause undue discrimination against or cause any undue burden upon interstate commerce because the intrastate rates do not include the increases authorized in the interstate rates in Ex Parte Nos. 262, 265, and 267 which, when compounded, amount to approximately 28.1 percent.

The proceedings before the ICC upon the railroads' "Petition under § 13 Seeking Increased Intrastate Rates", dated July 9, 1970, and filed July 13, 1970, are identified by Docket No. 35301, West Virginia Intrastate Freight Rates, 1970. The § 13, mentioned in the petition, refers to § 13 of the Interstate Commerce Act, first enacted February 4, 1887, and last amended by the Congress on August 12, 1958. 49 U.S.C., § 13. Paragraph (4) of § 13, of basic importance in this litigation, is quoted as follows:

§ 13, par. (4). Duty of Commission where State regulations result in discrimination. Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State), which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference,

prejudice, discrimination, or burden: *Provided,* That upon the filing of any petition authorized by the provisions of paragraph (3) of this section to be filed by the carrier concerned, the Commission shall forthwith institute an investigation as aforesaid into the lawfulness of such rate, fare, charge, classification, regulation, or practice (whether or not theretofore considered by any State agency or authority and without regard to the pendency before any State agency or authority of any proceeding relating thereto) and shall give special expedition to the hearing and decision therein. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding.

The railroads' initial petition to the ICC related only to Ex Parte No. 262 and Ex Parte No. 265. An amended petition, dated November 20, 1970, was filed to include Ex Parte No. 267, as mentioned in the complaint above quoted. The thrust of the railroads' petitions is that, whereas the ICC interstate railroad freight rates authorized by the three Ex Parte rate proceedings have been made effective interstate, the comparable West Virginia intrastate rates have not been effected, with needed revenues being lost by the carriers. The initial petition states:

The failure of West Virginia to grant the increases here sought has caused unjust discrimination against and an undue burden on interstate commerce. The carriers are now applying the greater part of both increases on their interstate traffic. But intrastate traffic in West Virginia is not shouldering its share of the burden.

The amended petition concludes with the following language:

. . . Petitioners request an order removing discriminations against

and burdens upon interstate commerce by granting the full X-262, X-265, and X-267 increases, subject to such adjustments as are necessary to make the West Virginia increases conform to the interstate increases. Petitioners ask that the three increases be treated as separable and that relief in X-262 not be delayed pending disposition of X-265 or X-267.

The PSC petitioned ICC for a joint hearing on the railroads' petitions, pursuant to 49 U.S.C., § 13(3), but the ICC denied the joint hearing. Appalachian Power Company, later an intervening plaintiff in this action, petitioned the ICC for a reconsideration of the denial of the joint hearing, opposed the railroads' petition for leave to amend their initial petition, and replied to the amended petition. Included with Appalachian's reply as Appendix A is a copy of the PSC order of June 23, 1970, denying in West Virginia intrastate rates comparable to the rates in effect interstate under Ex Parte No. 262. The Exhibit discloses that notice was given and a hearing was held on the railroads' request for the PSC to allow intrastate rate increases comparable to the interstate rates effected under Ex Parte No. 262. The PSC order states as follows concerning the evidence presented by the railroads:

The railroads' evidence as to coal rates was designed to show that intrastate rates on coal shipments are depressed. To establish this point, respondents' witnesses started with West Virginia intrastate rates effective in 1937 or 1942 and added increases which have been allowed by the Interstate Commerce Commission since that time to show that if those interstate increases had been added to the intrastate rate the rates would have been much higher than they are. However, on cross examination, the witnesses were unable to say that interstate rates on which substantial volumes of coal move have increased any more than West Virginia intrastate rates.

The respondents also presented evidence for the five Class I railroads operating in West Virginia, showing increases in operating expenses and a decline in net revenues and rate of return. According to this evidence, the five railroads had a return of 1.87 percent for 1968. This figure was greatly affected by a deficit of the Penn Central. The respondents also projected increased operating costs above the 1968 level, but the respondents (protestants) strenuously attacked some of these projections.

The PSC expressed dissatisfaction with the quality and quantity of evidence presented by the railroads, denied the intrastate rate increases comparable to the interstate rates in effect under Ex Parte No. 262, and ordered the railroads to refund to their customers the amounts of increased rates collected under the filed tariff supplement, together with interest thereon at 4 percentum per annum. The decision of the PSC was influenced by provisions of the West Virginia statute, West Virginia Code, § 24–2–2, directing that "in no case shall the rate, toll or charge be more than the service is reasonably worth, considering the cost thereof." Comments of the PSC in its order states its position in the following language:

Whether one seeks to apply the statutory test that the rates shall not be more than the service is reasonably worth considering the cost thereof or the more common statement that the rates should produce revenues sufficient to enable the respondents to pay their reasonable operating costs and taxes, provide for depreciation, and earn a fair return on their property used and useful in their public service business, it is impossible to apply the test to the respondents' West Virginia intrastate rates using the evidence in this case.

Although it would be an unreasonable burden to insist that the railroads break down their costs on every shipment and every mile of track, surely it is possible to make a meaningful breakdown of West Virginia revenues and costs without an unconscionable expenditure of time and money.

In this case we are faced with the alternative of simply rubber-stamping the increases approved by the Interstate Commerce Commission for application elsewhere without knowing whether they are too high or too low as applied to West Virginia intrastate business, or of denying the increases, with the railroad having the right to reapply when and if they think they can support increased rates. Faced with these alternatives, we choose the latter.

Intervening proceedings before and orders of the ICC culminated in the order of July 29, 1971, served on August 13, 1971, broadening the scope of the investigation initiated on the railroads' petitions pursuant to provisions of 49 U. S.C., § 13(4). The following paragraph quoted from the order indicates the objects and purposes of the investigation:

*It is further ordered.* That the petition for reconsideration be, and it is hereby, granted, and that the investigation instituted by order of the Commission, Division 2, on September 14, 1970, as supplemented, modified, or amended by the order of February 5, 1971, be, and it is hereby, broadened to investigate whether the rates and charges of the carriers by railroad operating in the State of West Virginia for the transportation of property, made or imposed by authority of the State of West Virginia, cause or will cause, by reason of the failure of said rates and charges to include increases corresponding to those permitted by this Commission for the transportation of interstate or foreign commerce in Ex Parte No. 267, Increased Freight Rates, 1971, *supra*, in addition to those authorized in Ex Parte No. 262, Increased Freight Rates, 1969, *supra*, and Ex Parte No. 265, Increased Freight Rates, 1970, *supra*, any undue or unreasonable advantage,

preference, or prejudice, as between persons or localities in intrastate commerce, on the one hand, and interstate or foreign commerce, on the other hand, or any undue, unreasonable, or unjust discrimination against or undue burden upon interstate or foreign commerce, and to determine what rates and charges, if any or what maximum, or minimum, or maximum and minimum rates and charges shall be prescribed to remove the unlawful advantage, preference, discrimination, or undue burden, if any, that may be found to exist.

Upon proper notice by and orders of the ICC, a hearing on issues incident to the investigation was held at Charleston, West Virginia, on August 17–20, 1971.

In addition to the pleadings and orders in this immediate action, the record developed before the Hearing Examiner and the ICC has been transmitted to the Court and is a part of the record herein. The ICC record includes docket items Nos. 19 through 26. Item No. 19 contains the statements and affidavits of several individuals.[1] Docket Item No. 20 embraces the testimony of witnesses before the Hearing Examiner at the hearing at Charleston, West Virginia, on August 17, 18, 19 and 20, 1971, including the testimony of Charles H. Manning, Roy N. Steele, T. H. Rollins, G. A. Pounds, Michael J. Dooley, William P. Collins, C. C. Manning, Jr., V. H. Jordan, Richard W. Bond, Charles F. Smith, Frank W. Rogers, Ralph H. Burns, William H. Ruby, Jr., H. O. Sheppe and Leroy E. Peabody, Jr., earlier identified as making statements and affidavits in the investigation. Two other witnesses, George M. Riley, Director of Coal Rates for The Chesapeake and Ohio Railway Company and The

1. These individuals and their affiliations are as follows:

1. Charles H. Manning, Assistant General Manager of the Southern Region of the Chesapeake and Ohio Railway Company and of the Baltimore and Ohio Railroad Company, Huntington, West Virginia.

2. Roy N. Steele, Manager Transportation of the Atlantic and Pocahontas Regions of the Norfolk and Western Railway Company, Roanoke, Virginia.

3. T. H. Rollins, Assistant Superintendent of the Monongah Division of the Baltimore and Ohio Railroad Company, Grafton, West Virginia.

4. G. A. Pounds, Research Statistician in the Economics and Finance Department, Association of American Railroads, Washington, D. C.

5. Michael J. Dooley, Manager of Coal and Ore Pricing, Penn Central Transportation Company, Philadelphia, Pennsylvania.

6. William P. Collins, General Freight Agent of The Baltimore and Ohio Railroad Company, Baltimore, Maryland.

7. C. C. Manning, Jr., Coal Traffic Manager of the Norfolk and Western Railway Company, Norfolk, Virginia.

8. Edwin C. Schroeder, Coal Traffic Manager-Rates of The Baltimore and Ohio Railroad Company, Baltimore, Maryland.

9. V. H. Jordan, Manager Coal Rates of The Chesapeake and Ohio Railway Company, Richmond, Virginia.

10. Richard W. Bond, Senior Cost Consultant in the Finance Department of The Chesapeake and Ohio Railway Company and The Baltimore and Ohio Railroad Company, Cleveland, Ohio.

11. Joseph S. Jones, State Highway Engineer—Construction for the West Virginia Department of Highways, Charleston, West Virginia.

12. Wallace M. Sinclair, Limestone Purchaser for Union Carbide Corporation, South Charleston, West Virginia.

13. Charles F. Smith, Manager of Sales and Traffic, Acme Limestone Company, Fort Spring, West Virginia.

14. Frank W. Rogers, Vice-President of Black Rock Contracting, Inc., Charleston, West Virginia.

15. Ralph H. Burns, President of R. H. Burns Co., Inc., Ralph Burns' Paving Co., Inc., and B & B Asphalt Products, Incorporated, Hillsboro, West Virginia.

16. William H. Ruby, Jr., Vice-President and General Manager, Acme Limestone Company, Fort Spring, West Virginia, and Vice-President of Raleigh Ready-Mix and Asphalt, Inc., Sprague, West Virginia.

17. H. O. Sheppe, Commerce Agent of The Chesapeake and Ohio Railway Company, Richmond, Virginia.

18. William L. Bailes, Jr., Attorney and Consultant, Washington, D. C.

19. Leroy E. Peabody, Jr., President of L. E. Peabody & Associates, Transportation Consultants, Lanham, Maryland.

Baltimore and Ohio Railroad Company, Baltimore, Maryland, and A. N. Salvato, Coal Traffic Manager for the Western Maryland Railway Company, Baltimore, Maryland, testified before the Hearing Examiner and were cross-examined.

In this action judicial review is primarily concerned with the quality and quantity of relevant evidence—whether the ICC's challenged decision order is supported by substantial evidence in the record. The parties plaintiff and the parties defendant are not in agreement on their interpretation and appraisal of the evidence. PSC's complaint asserts that the "findings and conclusions in the report of Review Board Number 4 are not supported by the evidence, and, in fact, are directly contrary to all of the competent evidence in the record." Appalachian Power Company's complaint states that ICC's ultimate findings and conclusions "are not supported by any competent evidence in the record and are in direct conflict with the evidence." National Steel Corporation's complaint asserts that the ICC ultimate findings and conclusions "are empty recitals of the judicially established requirements for ICC involvement in the area of intrastate rates. They are unsupported by subsidiary findings, are without evidentiary support and are directly contrary to the only competent evidence on the issues." Arguments in plaintiffs' briefs support their positions as stated in their complaints. Defendants' answers do not present detailed positions on the evidence. In their answers defendants deny plaintiffs' positions but in their briefs defendants detail their arguments on the quality and quantity of the evidence. Concluding language of the railroads' brief states:

There was substantial evidence before the Commission to justify each of the five findings required to justify a prescription of higher intrastate rates. Interstate rates, both generally and specifically, were shown by the railroads to be more than 28.1% higher than West Virginia rates. The ICC's order will result in no higher rates on West Virginia traffic than are actually in effect interstate because many kinds of West Virginia traffic have been excluded from this case. . . .

The statements and affidavits of the 19 persons, as above identified, in the ICC record, now a part of the record in this action, have been read and examined with care. Some of the statements and affidavits support plaintiffs' position and some support defendants' position. The affidavit of Richard G. Warren, Director of Traffic and Transportation for intervening plaintiff National Steel Corporation, and the affidavit of Elizabeth V. Hallanan, Chairman of the Public Service Commission of West Virginia, presented in support of the motion for the interlocutory injunction, do not discuss evidence. The testimony of witnesses, on direct and cross-examination, before the Hearing Examiner, a transcript of which is now a part of the record in this action, has been read and examined with care. Some of the witnesses supported plaintiffs' position and some supported defendants' position. The Hearing Examiner inquired as to further presentations and, none being heard, he closed the hearing.

The 29-page report and order recommended by the Hearing Examiner, dated December 21, 1972, made Appendix D with plaintiff's complaint, contains an extensive review of the evidence, with ultimate findings and conclusions thereon. The 28-page report of the Interstate Commerce Commission, by Review Board Number 4, dated January 8, 1973, made Appendix C with plaintiff's complaint, likewise contains an extensive review and analysis of the evidence, including the Hearing Examiner's recommendations and the exceptions of the several parties thereto. The ICC's ultimate findings and conclusions, the bases of its order of May 4, 1973, with service date of May 21, 1973, now at issue in this action, are as follow:

## ULTIMATE FINDINGS AND CONCLUSIONS

The increases authorized in Ex Parte Nos. 262, 265, and 267, were

based on the respondents' and other railroads' need for additional revenues to meet increased operating expenses. These expenses are incurred on both interstate and intrastate traffic. The respondents here seek from the West Virginia intrastate traffic a revenue contribution to these operating expenses proportionate to the contribution made by such traffic prior to the increases authorized in Ex Parte Nos. 262, 265, and 267. The Commission has recognized such prior contribution as a valid criterion of fairness. See Intrastate Freight Rates and Charges, 1969, *supra*, and North Carolina Intrastate Freight Rates and Charges. 293 I.C.C. 541, 558 (1954).

The evidence of record here shows that the conditions incident to the West Virginia intrastate transportation of freight are no more favorable than to such interstate transportation of freight. To the extent •that the West Virginia intrastate rates and charges do not reflect Ex Parte Nos. 262, 265, and 267 increases, they are abnormally low and fail to provide their share of the needed additional revenue, and cause unjust discrimination against, and an undue burden on interstate commerce.

We find that:

1. The conditions incident to the intrastate transportation of freight in West Virginia are not more favorable than those incident to interstate traffic in that State and adjoining States.

2. The amounts and percentages by which the interstate freight rates, between points in West Virginia and points in other States, were increased in Ex Parte Nos. 262, 265, and 267 are just and reasonable.

3. The present West Virginia intrastate rates and charges imposed by the authority of that State for the intrastate transportation of property, are unduly low and are not contributing their fair share of the earnings required to yield revenue sufficient to enable the respondents, under honest, economical, and efficient management to provide adequate and efficient transportation service at the lowest cost consistent with the furnishings of such service, and thereby accomplish the purposes of the Interstate Commerce Act, as set forth in the National transportation policy declared by Congress, to develop and preserve a national transportation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense; the burden, thus cast upon interstate commerce is undue to the extent that the intrastate rates and charges are less than they would be on the basis herein prescribed; and these intrastate rates and charges cause and for the future will cause, undue, unreasonable, and unjust discrimination against interstate commerce.

4. The unlawfulness herein found to exist should be removed by applying to the West Virginia intrastate rates and charges the same respective increases as are maintained by the respondents on like interstate freight between points in West Virginia and points in adjoining States, as ·permitted in Ex Parte Nos. 262, 265, and 267.

5. The establishment of increases in intrastate rates and charges as required in finding 4 will not result in unreasonable rates or charges nor in rates or charges that are unreasonable in relation to interstate rates or charges, and will increase substantially the respondents' revenues.

6. The increased revenue to the respondents, which will result from the increased rates and charges as provided in finding 4, are required from intrastate traffic in West Virginia in order to enable the respondents to provide adequate and efficient railway transportation service.

7. This decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

8. The increases as required in finding 4 are shown to meet the criteria for rate increases established under current regulations promulgated by the Commission pursuant to the Wage and Price Stabilization Program.

The foregoing ultimate findings and conclusions are without prejudice to the right of any interested party to apply for a modification thereof, regarding any specific intrastate rates, on the grounds that such rates or charges are not related to the interstate rates and charges on like freight in such a way as to contravene the provisions of the Interstate Commerce Act.

An order effectuating the foregoing findings and conclusions will be entered, unless this Commission is notified by the West Virginia Public Service Commission within 30 days from the date of service of this report, that it will permit the increases herein approved to take effect.

The report of the Hearing Examiner and the report of the ICC's Review Board Number 4 manifest extensive and detailed study and consideration of the statements, affidavits and testimony in the record. While the Court may view some of the evidence in a different light and may weigh some of the factors involved in different balances, settled principles of law dictate that the findings and conclusions of the administrative agency are not to be disturbed on judicial review unless such findings and conclusions are without support of substantial evidence. 5 U.S.C., § 706. The Court, upon careful review of the evidence and reports, cannot say that the ICC's ultimate findings and conclusions lack bases of substantial evidence in the record.

Paragraph 4 in the ultimate findings and conclusions, as above quoted, warrants careful reading in conjunction with a paragraph of the ICC's corrected order of May 4, 1973, served May 21, 1973. Paragraph 4 provides that the unlawful variance found to exist between the interstate rates and the intrastate rates in West Virginia "should be removed by applying to the West Virginia intrastate rates and charges the same respective increases as are maintained by the respondents on like interstate freight between points in West Virginia and points in adjoining States, as permitted in Ex Parte Nos. 262, 265, and 267." The original May 4, 1973, order used the word "interstate" instead of "intrastate" at one point and the corrected order was entered and served on May 21, 1973. The importance of the order lies in its translation of the language of paragraph 4 of the findings and conclusions into action. The order provides:

*It is further ordered,* That subject to the provisions of the next succeeding paragraph, the said respondents, according as they participate in the transportation be, and they are hereby notified and required to establish, 45 days from the date of service of this order, upon not less than one day's notice to the Interstate Commerce Commission and to the general public by filing and posting in the manner prescribed in section 6 of the Interstate Commerce Act, and thereafter to maintain and apply for intrastate transportation from and to points in the State of West Virginia, rates and charges which shall not exceed the rates and charges found reasonable in the decision and order of the Commission, Review Board Number 4, decided January 8, 1973.

Much controversy has been generated in the briefs concerning the meaning of the ICC order—whether the order requires and prescribes a 28.1% increase in West Virginia intrastate freight rates, regardless of the level of interstate rates now in effect in West Virginia, or whether the order requires that the West Virginia intrastate rates be raised to the level of the interstate rates on interstate freight in the state actually maintained by the railroads as permitted in Ex Parte Nos. 262, 265, and 267. Not all of the interstate rate

increases permitted by Ex Parte Nos. 262, 265 and 267 have been effected and are now maintained by the railroads on interstate freight in West Virginia. The reply brief of plaintiff, Public Service Commission, denies a mis-reading of the order. It appears to be the PSC position that the order requires and prescribes a 28.1% increase in intrastate freight rates in West Virginia regardless of the level of interstate rates in effect and maintained under Ex Parte Nos. 262, 265 and 267. The PSC contends that the ICC and the railroads have "switched their ground" —that the order as written is "completely indefensible." The PSC brief further states "we did not mis-read the Commission's order, and the last-minute attempted concession, if that's what it is, cannot save the Commission's decision and order from reversal." The Court finds no difficulty in the meaning of the order and proceeds with the clear understanding that the order requires and prescribes that the intrastate rates in West Virginia are to be established and maintained by the railroads at the same level as the interstate rates and charges "on like interstate freight between points in West Virginia and points in adjoining States, as permitted by Ex Parte Nos. 262, 265, and 267." This will be consistent with the ICC's responsibilities and requirements under provisions of 49 U.S.C., § 13(4).

In the light of our analysis of the record in this case, the law clearly mandates that the order of the Interstate Commerce Commission be approved. The argument of the plaintiffs that the order of the ICC is an unwarranted invasion of areas of rate-making properly reserved to the state was considered and rejected in the case of State of N. C. ex rel. North Carolina Utilities Com'n v. I. C. C., 347 F.Supp. 103 (E.D.N.C. 1972), aff'd 410 U.S. 919, 93 S.Ct. 1362, 35 L. Ed.2d 582 (1973). The issues presented to the court in that case were quite similar to those in the present controversy and the court observed:

Plaintiff contends that the action of the Interstate Commerce Commission in the case below constitutes an unconstitutional incursion by Federal authority into an area reserved for the states. It is well settled that the Commerce Clause of the United States Constitution extends Federal power to intrastate rates of carriers which are found to interfere with interstate commerce. Unjust discrimination against and undue burdens upon interstate commerce caused by intrastate rates are therefore legitimate areas for Federal action under the Constitution. Any action of Congress dealing with this area is constitutional. Railroad Comm'n of Wisc. v. Chicago, B. & Q. R. R. (1922), 257 U.S. 563, 42 S. Ct. 232, 66 L.Ed. 371; Alabama v. United States, 141 F.Supp. 488 (N.D. Ala.1956).

The plaintiffs stress the point that under the Interstate Commerce Commission's interpretation of Section 13(4) that it would be given general authority over the levels of intrastate rates. This is not so. The Commission's only power under the section is to remove undue discrimination or burdens it finds to exist against interstate commerce. It has no general regulatory powers over the levels of intrastate rates and its powers extend only to those limited areas involving injury to interstate commerce. 347 F.Supp. at 109.

The basis of the final authority of the ICC in this area was succinctly stated in Houston & Texas Ry. v. United States, 234 U.S. 342, 351, 34 S.Ct. 833, 836, 58 L.Ed. 1341 (1914):

. . . Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field . . . .

Whether we might have been inclined to a different conclusion upon the evidence is immaterial. The restrictive nature of our review was recently restated by the Court in Atchison, Topeka and Santa Fe R. Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973).

Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power."

Accordingly, since we find the decision of the Commission to be supported by substantial evidence, under the appropriate criteria of review it must be sustained.

 Upon consideration of the record in this action, together with the briefs of counsel, the Court finds and concludes:

1. The Court has jurisdiction of the action. 28 U.S.C., §§ 1336, 2284, 2321–2325; 49 U.S.C., § 17(9); 5 U.S.C., §§ 701–706.

2. The record of the action has been adequately developed and the case has been submitted to the Court for decision on the merits.

3. Judicial review of the action of the Interstate Commerce Commission in this case is limited and, if the Commission's decision order is based on clear findings supported by substantial evidence, the decision and order must be affirmed. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); Arkansas Grain Corp. v. United States, 263 F.Supp. 480 (E.D.Ark.1966).

4. The record discloses no action or intent of action by the Congress and the Interstate Commerce Commission to exceed the powers delegated to the federal government for regulation and control of interstate commerce. United States Constitution, Article I, Section 8, paragraph 3.

5. The findings and conclusions of the Interstate Commerce Commission are clear and adequate and are supported by substantial evidence in the record. King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301 (1952); Public Service Commission of Utah v. United States, 356 U.S. 421, 78 S.Ct. 796, 2 L. Ed.2d 886 (1958).

6. The order of the Interstate Commerce Commission, dated May 4, 1973, as corrected and as served on May 21, 1973, requires that the intrastate rates and charges in West Virginia be established and maintained by the railroads at the same level as on like interstate freight between points in West Virginia and points in adjoining states, as permitted in Ex Parte Nos. 262, 265 and 267. 49 U.S.C., § 13(4).

7. The order of the Interstate Commerce Commission permits modification of the intrastate rates and charges, regarding any specific intrastate rates, on the grounds that such rates or charges are not related to the interstate rates and charges on like freight in such a way as to contravene the provisions of the Interstate Commerce Act. State Corporation Commission of Kansas v. United States, 216 F.Supp. 376 (D.Kansas 1963), affirmed 375 U.S. 15, 84 S.Ct. 60, 11 L.Ed.2d 39.

8. The supremacy of national power over interstate commerce and related intrastate commerce controls proceedings in this action over any state statutory rate tests, including provisions of the West Virginia statute that "in no case shall the rate, toll or charge be more than the service is reasonably worth, considering the cost thereof." W.Va. Code, § 24–2–2; Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U.S. 563, 589–590, 42 S.Ct. 232, 66 L.Ed. 371 (1922).

Wherefore, upon the foregoing findings and conclusions and upon considera-

tion of the entire record of proceedings in this action, it is

Adjudged and ordered:

1. The interlocutory injunction, *pendente lite*, heretofore granted in this action on motion of intervening plaintiff National Steel Corporation, on August 9, 1973, warranted and appropriate on the record and evidence then presented, is hereby dissolved and vacated.

2. The indemnity bond executed by the intervening plaintiff and filed herein incident to the issuance of the interlocutory injunction is hereby released and discharged.

3. The prayer and request of plaintiff Public Service Commission of West Virginia and of the intervening plaintiffs Appalachian Power Company and National Steel Corporation for a permanent injunction, permanently enjoining, setting aside and annulling the decision and orders of the Interstate Commerce Commission, dated May 4, 1973, as corrected and later served, are hereby denied.

4. Proceedings in this cause being concluded, the action is closed and dismissed from the Court's docket.

5. The Clerk shall mail, by United States mail, certified copies of this Memorandum Opinion and Order to all counsel of record in the action.

Judge KNAPP would enjoin the orders of the Interstate Commerce Commission and reserves the right to file a dissenting opinion.

DENNIS R. KNAPP, Chief District Judge (dissenting).

I respectfully dissent from the conclusions reached by the majority in denying the relief sought by plaintiff and intervening plaintiffs herein. I would grant the injunction. Inasmuch as the majority, in a well-articulated opinion, have thoroughly presented the history of the litigation, the factual matters and issues of law raised thereby, together with citations of authority in support of their conclusions, I shall proceed directly to a consideration of the basis for my disagreement with the majority.

Succinctly stated, and with all deference to the majority, I believe they have misapplied the principles of law they enunciate to the particular facts and circumstances of this case. It is of utmost significance to keep in proper perspective the objects and purposes of 49 U.S. C.A. § 13(4), and the fact that the duties and responsibilities of the federal and state regulatory bodies are so interrelated that mutual cooperation of the agencies is contemplated. I am convinced that the provisions of the aforesaid section require a searching and intensive investigation by the federal agency as a prerequisite to the ICC's report and orders. In view of the fact that the defendants made absolutely no attempt to justify its tariffs in a proceeding before the Public Service Commission of West Virginia, I say they failed in a duty imposed by the implied, if not the express, terms of the statute. Indeed, the fact that the order of the ICC contains a provision for modification of specific intrastate rates found unrelated to interstate rates lends credence to the thesis that the investigation, report and consequent orders of the ICC were made without the required degree of factual development contemplated by the Act. It is to be noted also that the Commission reversed the findings of the Administrative Law Judge who heard the evidence; and did so without any effort to explain or distinguish its findings and conclusions from that of its fact finder.

While conceding that the question of the weight of the evidence is one for the Commission and not the Court, State of Florida v. U. S., 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077, nevertheless, the ICC must base its order on evidence which is substantial. State of South Carolina v. United States, D.C., 136 F.Supp. 897, aff'd 351 U.S. 944, 76 S.Ct. 845, 100 L.

18

Ed. 1470; Mississippi Public Service Comm. v. United States, D.C., 124 F. Supp. 809, aff'd 349 U.S. 908, 75 S.Ct. 599, 99 L.Ed. 1244. And that requirement contemplates evidence that is relevant to every factor involved in rate making. The failure of the ICC to comply with that requirement of substantial evidence results in a dilution of the standards of administrative due process and should not go unchallenged. A rate thus contrived and put into effect is not a fair and just rate and imposes an unfair burden on the consuming public, not to mention the economic dislocation created thereby. Moreover, it should be noted that different conditions, circumstances and statutory requirements in different states require and justify different results in fixing intrastate freight rates; and the findings of a state regulatory body which is familiar with such conditions in the state, when its opinion differs from the Commission's findings, weighs heavily against the conclusions of that agency. Mississippi Public Service Commission v. U. S., supra.

I do not agree that under the particular facts and circumstances of this case, as above related, the orders of the Commission are supported by substantial evidence.

Adopting the premise hereinabove set out, particularly in that the ICC chose apparently to ignore the state agency involved, and failed to conduct an inquiry of the depth and magnitude I believe was contemplated by the statute and dictated by the circumstances, I am of the firm opinion that the ICC abused its powers. I conclude, therefore, that its actions in the premises were unwarranted and without support in law, and that consequent orders exceeded the limits of its authority under the statute by the terms of which it purported to act.

For the foregoing reasons, I respectfully dissent.